**WO**

KAB

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Laura Gonzalez, individually and on behalf of the statutory beneficiaries of Ramon Timothy Lopez, and in her personal capacity as the personal representative of the estate of Ramon Timothy Lopez, | No. CV-21-01340-PHX-MTL (DMF) |
| Plaintiff, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

Plaintiff Laura Gonzalez, individually and on behalf of the statutory beneficiaries of Ramon Timothy Lopez, and in her personal capacity as the personal representative of the estate of Ramon Timothy Lopez, brought this civil rights action pursuant to 42 U.S.C. § 1983 and Arizona state law.  (Doc. 1.)  Defendants move for summary judgment on all claims, and Plaintiff opposes.  (Docs. 102, 114.)

## I.    BACKGROUND

In her Complaint, Plaintiff asserted the following claims: (1) Fourth Amendment false arrest and excessive force against Defendant City of Phoenix Police Officers Cozad, Jimenez, Lingenfelter, Lopez, Mosley, Stevens, and Williams (Count One); (2) Fourteenth Amendment right to familial society and companionship against Defendant City of Phoenix Police Officers Cozad, Jimenez, Lingenfelter, Lopez, Mosley, Stevens, and Williams

(Count Two); (3) *Monell* claims against the City of Phoenix based on the assertions that the City of Phoenix (a) failed to train its officers regarding the proper use of force, including submission techniques that pose a risk of serious injury or death to the subject and the risk of positional asphyxia, particularly against individuals who are mentally disturbed, restrained, or handcuffed; (b) failed to train its officers regarding proper interactions with individuals who are mentally disturbed, whether because of mental illness or intoxication; (c) had policies, customs, or procedures that encouraged police officers to escalate situations and allowed them to utilize submission techniques, which posed a significant risk of injury or death, thereby using more force than reasonably necessary; and (d) created a culture of impunity that encouraged officers to use deadly force by purging officer discipline records and delaying or slowing the release of information regarding use of force incidents. (Count Three); and (4) wrongful death against the City of Phoenix (Count Four).

## II.    SUMMARY JUDGMENT STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102–03 (9th Cir. 2000).  But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).  The nonmovant need not establish a material issue of fact conclusively in its

favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255. The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III.   FACTS**[1]

On August 4, 2020, Defendant Phoenix Police Officers Stevens, Williams, and Mosley responded to a 9-1-1 caller, who reported that a man was looking into cars, sticking his tongue out, and scratching or "fondling his private parts" over his clothes. (Doc. 103 ¶ 1; Doc. 115 ¶ 1.) Once at the scene, the Officers watched as the man later identified as Ramon Timothy Lopez emptied the contents of a wallet and threw the wallet on the ground. (Doc. 103 ¶ 2; Doc. 115 ¶ 2.)[2] The officers did not know whether Lopez had stolen the wallet, but they claim they were concerned, based on his behavior and the earlier report, that he might have. (Doc. 103 ¶ 3; Doc. 115 ¶ 3.)[3] Officer Stevens approached Lopez in

---

[1] There is body-worn camera ("BWC") footage of the incidents submitted by Defendants and Plaintiff. The Court has reviewed all the footage submitted by the Parties. Where video evidence is available in an excessive-use-of-force case, courts should view the facts in the light depicted by the video evidence. *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Courts must still draw all reasonable inferences from the video evidence in the nonmovant's favor. *Williams v. Las Vegas Metro. Police Dep't*, No. 2:13-CV-1340-GMN-NJK, 2016 WL 1169447, at *4 (D. Nev. Mar. 22, 2016) ("[t]he existence of the video does not change the usual rules of summary judgment: in general, the court will draw all reasonable inferences from the video in plaintiff's favor") (citation omitted).

[2] Plaintiff includes some disputes that are simply disagreements with the characterization of evidence. The Court will not note a "dispute" unless there is an actual dispute supported by controverting evidence.

[3] In the BWC footage, Officer Williams tells Officer Stevens "He dropped his wallet." Stevens asks, "This guy did?" Williams responds "Yeah, that's his wallet right

his patrol car and asked him, "What's your deal, man?"  (Doc. 103 ¶ 4; Doc. 115 ¶ 4.) Lopez acted erratic, paranoid, and looked like he was spooked; he began leap frogging from car to car and began running between vehicles, and Stevens followed slowly in his vehicle.  (Doc. 103 ¶ 5; Doc. 115 ¶ 5; Doc. 103-1 at 6.)  At one point, Lopez ran into a short wall and fell; Lopez was holding his side and sat down on the curb with his feet in the lane of travel; the officers believed that Lopez was under the influence of drugs, possibly methamphetamines.  (Doc. 103 ¶¶ 6, 8; Doc. 115 ¶ 6, 8.)

After he got up, Lopez ran through traffic and across the street to a liquor store. (Doc. 103 ¶ 7; Doc. 115 ¶ 7.)  Lopez entered the liquor store and Officer Stevens followed and exited his vehicle.  (Doc. 103 ¶ 9; Doc. 115 ¶ 9.)  Lopez quickly left the liquor store with an open bottle of iced tea.  (Doc. 103 ¶ 10; Doc. 115 ¶ 10.)[4]  As Lopez exited the liquor store, he saw Officer Stevens, who was outside the door of liquor store.  (Doc. 103 ¶ 11.)  Lopez threw the drink on him and started running away.  (*Id.*)[5]  Officer Stevens began to chase Lopez and stated, "you better f***ing stop."  (Doc. 103 ¶¶ 12–13; Doc. 115 ¶¶ 12–13; Stevens BWC at 5:33–5:34.)[6]

As he ran, Lopez repeatedly lifted the open bottle of iced tea over his shoulder, so the contents hit Officer Stevens as he was running.  (Stevens BWC at 5:38–5:45.)  Officer

there."  (Stevens BWC at 0:58–1:01.)  Steven states, "He's high," and asks, "I don't know if you want to grab his wallet?  See if he has ID?"  Williams responds, "Nah, he took the stuff out of it."  Stevens replies "Ah, he did?  O.K."  (*Id.* at 1:09–1:47.)  Neither officer indicates that they suspect that the wallet was stolen.  Stevens later asks Williams if he retrieved the dropped wallet, and Williams replies "no."  (*Id.* at 4:26–4:30.)

[4] The Officers later learned that Lopez took the tea without paying.  (Doc. 115 at 19 ¶ 118.)

[5] Plaintiff attempts to dispute this by pointing to Stevens' body worn camera footage (Doc. 115 ¶ 11), but the footage does not support the dispute.  Stevens' testimony that Lopez threw the drink on him is undisputed.

[6] Plaintiff asserts that the order to stop was "almost inaudible" on the footage and "it is possible that Ramon did not hear the officer."  The order is plainly audible on the BWC footage and there is no evidence that Lopez did not hear the order.

1   Stevens believed this was intentional.  (Doc. 103 ¶ 15.)[7]

2          As Lopez was running into traffic for the second time during their foot chase,

3   Officer Stevens reached out to grab onto Lopez and fell to his knees, which brought Lopez

4   to the ground on his back.  (Doc. 103 ¶ 16.)[8]  Officer Stevens and Lopez were in the middle

5   of a busy street.  (Doc. 103 ¶ 17; Doc. 115 ¶ 17.)  At the time Lopez was apprehended, the

6   ambient air temperature in Phoenix was approximately 101 degrees, and the temperature

7   of the asphalt was approximately 145 degrees.  (Doc. 115 ¶ 128.)  Officers Williams and

8   Mosley caught up with Lopez and Officer Stevens in the middle of the street.  (Doc. 103 ¶

9   18; Doc. 115 ¶ 18.)  Officer Stevens took a moment to catch his breath once they arrived.

10  (Doc. 103 ¶ 19; Doc. 115 ¶ 19.)  He called for backup while Officers Williams and Mosley

11  held Lopez.  (Doc. 103 ¶ 20; Doc. 115 ¶ 20.)  Lopez resisted arrest by tensing up, swinging

12  his arms, and trying to kick as officers attempted to handcuff him.  (Doc. 103 ¶ 21.)[9]

13  Williams took Lopez's arm and held it and Officer Mosley held on to Lopez's other arm.

14  (Doc. 103 ¶¶ 23–24.)  Officer Mosley testified that Lopez exhibited "a great amount of

15  strength."  (Doc. 115-1 at 58.)  While attempting to handcuff Lopez, Officer Mosley said,

16  "Chill, chill.  We're good dude.  You're gonna get tased."  (Doc. 103 ¶¶ 28–29; Doc. 115

17  ¶¶ 28–29.)  Officer Williams radioed for additional officers to block the street, because

18  traffic was still moving around them during the struggle.  (Doc. 103 ¶ 32; Doc. 115 ¶ 32.)

19

20

21      [7] Plaintiff attempts to dispute Stevens' "belief" with the BWC footage, which
    Plaintiff contends shows that the liquid "inadvertently spilled from the bottle."  First, this

22  does not dispute Stevens' belief, but rather goes to whether the belief is reasonable.
    Second, the BWC footage does not support that the spilling was inadvertent as Plaintiff

23  plainly throws the liquid over his shoulder several times towards Stevens.

24      [8] Plaintiff's "dispute" to the characterization as to how the two went to the ground

25  is unsupported by any evidence.

26      [9] The body worn camera footage reflects Lopez initially fighting against the officers'

27  attempts to restrain him.  (Stevens' BWC at 6:18–6:20.)  The video also shows the officers
    order Lopez to roll over, but Lopez did not roll over, and the video shows Lopez kicking,

28  locking up his legs, and resisting officers attempts to straighten his legs.  (Stevens' BWC
    footage at 7:08–7:39; Williams' BWC at 0:40–2:39; 3:00–3:35.)

The officers coordinated their efforts and put Lopez face down on the pavement and handcuffed him.  (Doc. 103 ¶¶ 36–37; Doc. 115 ¶¶ 36–37.)  As he was being handcuffed, Lopez stated "You guys are killing me," while breathing heavily.  (Williams BWC at 0:807–0:809.)  Defendants contend that Officer Stevens placed Lopez in a recovery position by holding up his upper body, but Plaintiff asserts that Lopez was not in a "recovery position" as that means "moving the arrestee to his side, back, or an upright position." (Doc. 103 ¶ 39; Doc. 115 ¶ 39.)  Defendants do not point to any evidence that Stevens put Lopez in a recovery position and the videos do not reflect that Lopez was put on his side, back, or an upright position; indeed, the videos show Mosley kneeling on Lopez and keeping him held down during this time.  (Williams BWC at 3:30–5:08.)

Officer Stevens asked if anyone had a RIPP restraint, which is a device that may be temporarily used to "secure combative or violent subjects to prevent injury to the subject, officers, and others and to minimize the opportunity for escape." (Doc. 103 ¶¶ 40–41; Doc. 115 ¶¶ 40–41.)  In a RIPP restraint, the suspect's ankles are crossed and placed into the restraint, a long strap is then connected from the suspect's ankles to the suspect's wrists and attached to the handcuffs with a clip.  (Doc. 103 ¶¶ 42–43; Doc. 115 ¶¶ 42–43.)  Lopez moved his legs when they were not held down.  (Doc. 103 ¶ 44.)

Several officers, including Defendant Officers Lopez, Cozad, Jimenez, and Lingenfelter, arrived on scene in response to the call for back up.  (Id. ¶ 46; Doc. 115 ¶ 46.)  Officer Jimenez arrived with a RIPP restraint and Officer Stevens stepped back.  (Doc. 103 ¶ 47; Doc. 115 ¶ 47.)  Officer Mosley had one knee or both of his knees on Lopez from the time that he, Williams, and Stevens turned Lopez onto his stomach until the officers applied the RIPP restraint—a time span of 2 minutes and 55 seconds.  (Williams BWC at 2:36–5:31.)  Several officers assisted in putting the RIPP restraint on Lopez.  (Doc. 103 ¶ 53; Doc. 115 ¶ 53.)  Multiple officers instructed Lopez not to grab onto the strap as they were applying it.  (Doc. 103 ¶ 55; Doc. 115 ¶ 55.)[10]  Officer Jimenez ultimately clipped the

---

[10] The BWC footage reflects Lopez's fingers curling around the RIPP before officers shout "quit grabbing the rope."  (Hird BWC footage 1:46–1:52.)  Thus, the BWC footage

restraint back on the strap around Lopez's ankles.  (Doc. 103 ¶ 56; Doc. 115 ¶ 56.)  Officer Jimenez later testified that he needed to get Lopez out of the street quickly because of all the traffic and the danger to Lopez and the officers.  (Doc. 103 ¶ 58.)  After the RIPP restraint was applied, while Lopez was totally immobilized, Mosley continued to kneel with one knee on Lopez's back and the other knee on Lopez's hamstring for roughly another 55 seconds.  (Doc. 115 ¶ 171.)  While Mosley knelt on his back, Lopez was not moving; he was not resisting, combative, or threatening.  (*Id.* ¶ 172.)

Around the same time as the RIPP restraint was applied, Officer Cozad asked for someone to call for fire because she was concerned that Lopez was on drugs.  (Doc. 103 ¶ 61.)  Officer Williams made the call.  (Doc. 103 ¶ 62; Doc. 115 ¶ 62.)  Officer Cozad suggested that they move Lopez to a nearby Walgreens' parking lot to get him out of the street into the shade while they waited for the Fire Department to arrive.  (Doc. 103 ¶ 63.)

Officers told Lopez to "sit up, buddy" and "sit up man, relax," and tried to pull him to his feet.  (Doc. 103 ¶ 68.)[11]  They lifted Lopez and carried him face down to the back of Officer Lopez's Tahoe; Lopez was positioned face down with his hands cuffed and was in the RIPP restraint with his legs forced to bend up behind him. (Doc. 103 ¶ 69; Ligenfelter BWC at 1:49–1:52; Lopez BWC at 2:37–2:38.)  Officer Lingenfelter helped guide Lopez into the Tahoe from the other side of the vehicle.  (Doc. 103 ¶ 71.)

The Phoenix Police Tactical Training Manual on RIPP Restraint Hobble states that hogtying is not an appropriate use of the RIPP restraint, and states that, after application, the subject should be seated upright and monitored for a medical emergency.  (Doc. 115-1 at 362–370.)[12]  The Manual includes instructions on how a subject should be "Replaced in

_____

does not dispute the Officers' testimony that Lopez was grabbing onto the RIPP.

[11] Plaintiff asserts that, at this point, Lopez was "in significant distress, limp, and possibly losing consciousness."  But this assertion is contradicted by Ligenfelter's body worn camera footage showing that Lopez was alert at the time he was placed in the back of the vehicle.  (Ligenfelter BWC at 1:38.)  There is a dispute, however, as to whether Lopez could stand by himself at this point given the way he was restrained.

[12] The manual includes a picture of a subject being hogtied, showing a person

a Vehicle": "Remove clip from cuffs • 2 officers seat subject upright in vehicle • Have subject place feet on floorboard • Secure clip on ground w/foot and close the vehicle door • Attach clip to seatbelt of front seat – Don't leave strap loose outside door." (*Id.* at 368.) Phoenix Police Department Operations Order 7.1, "Prisoners," states that "[s]ubjects apparently under the influence of alcohol/drugs . . . may [be at] increased the risk of injury or death by positional asphyxiation when a suspect is kept face down for a prolonged period of time," and the guidelines for use of leg restraints instruct that "[i]f either of the restraints is applied, officers will minimize the face down exposure of the prisoner [and] [i]f the opportunity presents itself, officers should place prisoners in an upright position, on their side or back." (Doc. 115-1 at 130–131.)

Officers Lopez and Cozad then drove to the Walgreens' parking lot, which took under two minutes. (Doc. 103 ¶¶ 74–75; Doc. 115 ¶¶ 74–75.) When they arrived, Lopez was breathing, but unresponsive; Officers Cozad and Lopez pulled him out of the car, and performed a sternal rub to try to elicit a response, asking, "You okay? Wake up, wake up. Wake up, buddy." (Lopez BWC at 4:19–5:10.) Officers Lopez and Cozad removed the RIPP restraint. (Doc. 103 ¶ 82; Doc. 115 ¶ 82.) Officer Lopez attempted another sternum nub. (Doc. 103 ¶ 83; Doc. 115 ¶ 83.) Officers sat Lopez up against the Tahoe and Officer Cozad poured water on Lopez's head to cool him down. (Doc. 103 ¶ 85; Doc. 115 ¶ 85.) Lopez's eyes were rolled back in his head and Officer Ligenfelter remarked "I think he's seizing. Look at his eyes." (Doc. 115 ¶¶ 85, 199.) The Fire Department arrived minutes later and gave Lopez prompt medical attention, but he was unresponsive, apneic, and pulseless when they arrived. (Doc. 103 ¶ 86; Doc. 115 ¶ 86.)

Lopez was transported and declared dead at the hospital. (Doc. 103 ¶ 88; Doc. 115 ¶ 88.) A toxicology report revealed methamphetamine in his blood, and the Maricopa County Medical Examiner concluded that Lopez's cause of death was "[c]ardiac arrest in the setting of methamphetamine intoxication, dilated cardiomyopathy and physical

---

similarly situated to Lopez's position in the back of the vehicle with his legs bent up behind him so that he could fit while lying face down. (*Compare* Doc. 115-1 at 362 *with* Ligenfelter BWC at 1:49–1:52; Lopez BWC at 2:37–2:38.)

restraint" and that his manner of death was undetermined. (Doc. 103 ¶ 89; Doc. 115 ¶ 89.)[13]

## IV.   DISCUSSION

### A.   False Arrest (Count One)

Defendants[14] assert that the Officers had probable cause to arrest Lopez for: (1) running into traffic on a busy road, posing a danger to himself and others in violation of Arizona Revised Statutes § 28-793; (2) running from an officer in pursuit in violation of Arizona Revised Statutes § 13-2508; (3) assault on an officer based on throwing iced tea on Defendant Stevens in violation of Arizona Revised Statutes §§ 13-1203 and 13-1204; (4) "continuing to resist arrest" in violation of Arizona Revised Statutes § 13-2508 during the application of the RIPP restraint; and (5) being on methamphetamine in violation of Arizona Revised Statutes § 13-3407.[15] Defendants say that because they had probable

---

[13] Plaintiff's expert, Dr. Daniel Wohlgelernter, a board-certified cardiologist, opines that Lopez's death "was due to restraint/compressive asphyxia, secondary to compressive force applied to his shoulders, back, torso and extremities by the PPD officers, with prone restraint on hot pavement with severe thermal stress, with resultant respiratory compromise and subsequent development of hypoxia/hypoxemia causing PEA [pulseless electrical activity] and cardiac arrest." (Doc. 115 ¶ 207.) Plaintiff's expert, Dr. Daniel Spitz, a forensic pathologist, opines that Lopez's cardiac arrest was multifactorial and a result of (1) restraint asphyxia associated with forced prone restraint while handcuffed and RIPP restraint in the street; (2) positional asphyxia associated with being placed prone in the Tahoe while handcuffed and RIPP-restrained; (3) physical exertion and hyperthermia associated with the foot pursuit, struggle, and restraint against the hot pavement; and (4) methamphetamine intoxication. (*Id.* ¶ 89.)

[14] Defendants assert that only Stevens arrested Lopez as Officers Cozad, Jimenez, Lingenfelter, and Lopez did not arrive until after Lopez was detained, but Defendants do not argue for the dismissal of the false arrest claim against the other officers on the basis that they were not responsible for the arrest. Rather, Defendants assert that their arguments apply to each officer under the collective knowledge doctrine. (Doc. 102 at 8 n.6.)

[15] Defendants also claim that they "arguably had probable cause to arrest Lopez based on his behavior with the wallet and the call saying he was looking into vehicle." But they do not elaborate as to what alleged crime the Officers had probable cause to arrest Lopez for based on this behavior. There is a disputed issue of fact as to whether the Officers suspected that the wallet was stolen, as the video footage reflects that Stevens and Williams believed the wallet was Lopez's and that he dropped it because he was high. The Court will not further address this assertion. Moreover, Defendants assert that the Officers had

1   cause to arrest Lopez, they are entitled to summary judgment on the false arrest claim.

2   Defendants further assert that they are entitled to qualified immunity on the false

3   arrest claim because "[n]o case put the officers on notice that they lacked probable cause

4   to arrest" Lopez.  (Doc. 102 at 11.)

5   Plaintiff responds that the Officers did not have probable cause to arrest Lopez when

6   he was taken down in the street and handcuffed. Plaintiff asserts that jaywalking is not a

7   crime under Arizona Revised Statutes § 28-793, it was not a crime for Lopez to run when

8   he saw Stevens because no officer had told him he was under arrest, Lopez did not

9   intentionally throw the liquid on Officer Stevens as he ran, no reasonable officer would

10   interpret the spilled liquid as an assault on the officer, and the video contradicts the officers'

11   claims that Lopez resisted arrest "at any point in the encounter." (Doc. 114 at 13.) Plaintiff

12   finally asserts that "[b]ecause a reasonable jury could find the arrest violated Lopez's

13   clearly established Fourth Amendment right to be free from unlawful seizure, the Officer

14   Defendants are not entitled to qualified immunity." (*Id.* at 14.)

15   **1.   Legal Standards**

16   **i.   Fourth Amendment**

17   The Fourth Amendment requires an arrest to be supported by probable cause.

18   *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).  "Probable cause to arrest exists

19   when officers have knowledge or reasonably trustworthy information sufficient to lead a

20   person of reasonable caution to believe that an offense has been or is being committed by

21   the person being arrested."  *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007).

22   A police officer "is entitled to qualified immunity on a false arrest claim if a reasonable

23   officer in his position could have believed that probable cause existed."  *Norse v. City of*

24   *Santa Cruz*, 629 F.3d 966, 978 (9th Cir. 2010).

25   probable cause to believe Lopez stole the iced tea based on how quickly he was in and out

26   of the liquor store, but do not assert which crime Lopez allegedly committed.  While

27   officers may have had reasonable suspicion to believe that Lopez took the iced tea without

28   paying, they did not have probable cause to arrest at the point Defendant Stevens began his

pursuit of Lopez. Because Defendants did not complete this argument, they have not met

their burden on summary judgment and the Court will not further address it.

### ii.      Qualified Immunity

A defendant in a § 1983 action is entitled to qualified immunity from damages for civil liability if his conduct does not violate clearly established federal statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The qualified immunity analysis requires the court to make two distinct inquires, the "constitutional inquiry" and the "qualified immunity inquiry." *See Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002).  The "constitutional inquiry" asks whether, when taken in the light most favorable to the non-moving party, the facts alleged show that the official's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The "qualified immunity inquiry" asks if the right was clearly established at the relevant time. *Id.* at 201–02. In *Pearson v. Callahan*, the Supreme Court held that the two-prong procedure established in Saucier is not an inflexible requirement; judges are permitted to exercise their discretion in deciding which of the two prongs should be addressed first considering the particular case. 555 U.S. 223, 242 (2009).  That is, a court need not first determine if there was a constitutional violation before determining if a defendant is entitled to qualified immunity.

"A right is clearly established when it is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Waid v. Cnty. of Lyon*, 87 F.4th 383, 387 (9th Cir. 2023) (quotation omitted).  While a case need not be directly on point, existing precedent must "place the statutory or constitutional question beyond debate." *Id.* (cleaned up).  "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts." *Id.* (internal citations omitted).  "Cases cast at a high level of generality are unlikely to establish rights with the requisite specificity." *Id.* at 388 (internal citation omitted).  *"*While a case addressing general principles may clearly establish a right in an obvious case, such obvious cases are rare." *Id.* (cleaned up).  "[T]his obviousness principle, an exception to the specific-case requirement, is especially problematic in the

Fourth-Amendment context" "because a categorical statement that conduct obviously violates the Fourth Amendment is particularly hard to make when officers encounter suspects every day in never-before-seen ways, including countless confrontations that yield endless permutations of outcomes and responses." *Id.* (cleaned up).  As such, Fourth Amendment violations must be beyond debate to be considered obvious.  *Id.* (citation omitted); *Villanueva v. California*, 986 F.3d 1158, 1171 (9th Cir. 2021) ("Because excessive use of force is a highly fact-specific inquiry, even when we determine excessive force was used, 'police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue.'") (quoting *Kisela v. Hughes*, — U.S. —, 138 S. Ct. 1148, 1153 (2018)).

"Instead, a clearly established right usually requires controlling authority or a robust consensus of cases of persuasive authority." *Waid*, 87 F.3d at 388. (citations omitted).  "Plaintiffs must either explain why their case is obvious under existing general principles or, more commonly, show specific cases that control or reflect a consensus of non-binding authorities in similar situations." *Id.*  The Court must "view the facts as an officer would have encountered them on the night in question, not as an ex post facto critic dissecting every potential variance under a magnifying glass." *Monzon v. City of Murrieta*, 978 F.3d 1150, 1157 (9th Cir. 2020).

### 2.   Analysis

Defendants assert that they had probable cause to arrest Lopez for running into traffic on a busy road, posing a danger to himself and others in violation of Arizona Revised Statutes § 28-793.  Defendants cite to *State v. Davenport*, No. 2 CA-CR 2019-0096, 2019 WL 6359624, at *3 (Ariz. Ct. App. Nov. 27, 2019) and *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) for the proposition that an arrest can be made for jaywalking.

Under Arizona law, a violation of Arizona Revised Statutes § 28-793 is a civil traffic violation.  *See* Ariz. Rev. Stat. § 28-121(B).  Defendants do not cite to any Arizona law authorizing an arrest for a civil traffic violation.  *Atwater* specifically applies to *criminal* offenses, and, contrary to Defendants' argument, the Court in *Davenport* did not hold that

an arrest can be made for jaywalking.  *See Atwater*, 532 U.S. at 354 ("If an officer has probable cause to believe that an individual has committed even a very minor **criminal** offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.") (emphasis added); *Davenport*, 2019 WL 6359624 at *¶ 14.  Rather, the *Davenport* Court stated that after an individual was stopped for jaywalking and ignored officers' commands to remove his hands from his pockets during the investigatory stop, they were justified in restraining him and established probable cause for arrest when they "observed what appeared to be a small bag of marijuana in [the man's] hand."  *Id.*

Nonetheless, Plaintiff has not shown that it was clearly established that Defendant Stevens could not pursue Lopez to conduct a *Terry* stop to issue a civil citation for the crosswalk violation or to investigate Lopez's other actions.  *See Leibel v. City of Buckeye*, 556 F. Supp. 3d 1042, 1066–67 (D. Ariz. 2021) ("An officer conducting a *Terry* stop is authorized to take such steps as are reasonably necessary to maintain the status quo during the course of the stop. . . . This necessarily means that an officer conducting a *Terry* stop may use force to prevent the suspect from leaving before the stop has run its course.") (cleaned up) (citing cases).  As he was pursuing Lopez, Stevens stated "you better f***ing stop," a lawful command by a police officer, which Lopez ignored in violation of Arizona Revised Statutes § 28-622, and the video reflects Lopez throwing his iced tea over his shoulder at Stevens, which constitutes an assault under Arizona Revised Statutes § 13-1203(A)(3).  Accordingly, by the time Stevens apprehended Lopez, there was probable cause to arrest him, and Plaintiff has not shown that the initial pursuit of Lopez violated clearly established law. Defendants are therefore entitled to qualified immunity as to the Fourth Amendment false arrest claim.

## B.    Excessive Force (Count One)

Defendants assert that they are entitled to summary judgment on Plaintiff's excessive force claim because the *Graham* factors weigh in their favor, and they are entitled to qualified immunity.

Plaintiff argues that a reasonable jury could conclude that the Officer Defendants

used excessive force in violation of Lopez's rights and caused his death when: (1) Officers Stevens, Williams, and Mosley restrained Lopez in a prone position on searing hot asphalt after he was handcuffed; (2) Officer Mosley applied weight and pressure to Lopez's back for several minutes while Lopez was prone and handcuffed and continued to do so after Lopez was hogtied; (3) Officer Jimenez applied a RIPP restraint and secured it in a way that hogtied Lopez; (4) Officers Mosley, Stevens, Jimenez, and Lingenfelter positioned Lopez face down in the back of a police vehicle while he was handcuffed and hogtied; (5) Officers Lopez and Cozad transported Lopez to a nearby parking lot while he was prone, handcuffed, and hogtied; and (6) each of the Officer Defendants failed to intervene to stop the obviously unconstitutional actions of the other officers.  (Doc. 114 at 2.)

### 1.    Legal Standard

A claim that law enforcement officers used excessive force during an arrest is analyzed under the Fourth Amendment's "reasonableness" standard.  *Graham v. Connor*, 490 U.S. 386, 395 (1989).  This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests."  *Id.*  To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis assessing (1) the nature of force inflicted; (2) the governmental interests at stake, which involve factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect is resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary.  *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham*, 490 U.S. at 396–97, and *Miller v. Clark Cnty.*, 340 F.3d 959, 964 (9th Cir. 2003)).  "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20–22 (1968)).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Id.* at 396–97.

At the summary judgment stage, once the court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record," the question of whether an officer's actions were objectively reasonable under the Fourth Amendment is a "pure question of law." *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007). But an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force. *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc). Because the balancing test is "inherently fact specific, the determination whether the force used to effect an arrest was reasonable under the Fourth Amendment should only be taken from the jury in rare cases." *Green v. City and Cnty. of S.F.*, 751 F.3d 1039, 1049 (9th Cir. 2014) (internal quotation marks omitted); *see Smith*, 394 F.3d at 701 (excessive force cases often turn on credibility determinations, and the excessive force inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom") (quotation omitted).

## 2. Analysis

### i. Nature and Quality of the Intrusion[16]

In the *Graham* analysis, the Court must first evaluate "the type and amount of force inflicted." *Espinosa*, 598 F.3d at 537 (quotation omitted). "[E]ven where some force is justified, the amount actually used may be excessive." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

Plaintiff asserts that **"**the quantum of force" was severe and life threatening. Plaintiff does not discuss the individual instances of force used, but rather groups them all together. This is particularly problematic because Plaintiff's argument is based on the premise that Lopez never resisted, but the officer testimony and video are uncontradicted that Lopez resisted at certain points during the encounter. Plaintiff relies on *Drummond ex rel. Drummond v. City of Anaheim*, 343 F.3d 1052, 1056–57 (9th Cir. 2003), for the

---

[16] The Motion presents arguments regarding the initial takedown and handcuffing. Plaintiff does not dispute the reasonableness of these uses of force and the Court will not address them. *See* Doc. 114 at 14 ("Plaintiff does not dispute that some force was reasonable to take Ramon to the ground and handcuff him. . . .").

proposition that the force used here was severe and life threatening.  Plaintiff asserts that the Officer Defendants were aware that prone restraint is associated with serious injury or death due to positional asphyxia and that the risk of serious injury or death is greater if the subject is mentally disturbed, under the influence of drugs or alcohol, or if weight is applied to the subject, and the Officer Defendants suspected Lopez was under the influence of methamphetamine.  In support of this argument, Plaintiff cites the following deposition testimony of Defendants Williams, Mosley, and Stevens:

> Q. And so you understood, as part of your training, that subjects who appear to be under the influence of alcohol or drugs had increased risk of death or injury by positional asphyxiation if they were kept face down for a prolonged period of time, correct?
> . . . .
> [Williams]: For a prolonged period of ·time, yes.

(Doc. 115-1 at 5.)

> Q. You understood going into this incident that subjects that are in the prone position for too long a period of time are at risk for positional asphyxia, correct?
> . . .
> [Mosley]: Yes, sir.
> . . .
> Q. Were you trained that subjects that might be under the influence of narcotics like methamphetamine or exerting themselves while they're being pursued, if left in the prone position for too long then the use of narcotics could actually increase the risk of positional asphyxia?
> . . .
> [Mosley]: Yes.

(115-1 at 62–63.)

> Q. . . . . Do you recall ever being told -- do you recall being trained that you should ·minimize prone or face down time for restrained subjects?
> . . .
> [Stevens]: Yes.

(Doc. 115-1 at 26.)

After the initial takedown and handcuffing, the remaining uses of force are applying

the RIPP restraint, Mosley continuing to kneel on Lopez's back even after the RIPP restraint was applied, and the Officers transporting Lopez face down in a RIPP restraint with his knees bent behind him so that he could fit in the vehicle.

The amount of force used by Defendants was more than insignificant and must be justified by a similar level of "government interest [that] compels the employment of such force." *Deorle v. Rutherford*, 272 F.P3d 1272, 1280 (9th Cir. 2001).

### ii.   Government Interests and the Necessity of Force

The Court applies the *Graham* factors to evaluate the importance of the government interest at stake during Lopez's arrest. The first factor examines the severity of the crime at issue. *Espinosa*, 598 F.3d at 537. The second, and "most important *Graham* factor," is whether the arrestee "posed an immediate threat to the safety of the officers or others." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011). An officer's statement that he fears for his safety, or the safety of others, is not sufficient; "there must be objective factors to justify such a concern." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (citation and quotation omitted). The Court must balance the force used against the need for such force to determine whether the force used was "greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537 (quoting *Santos*, 287 F.3d at 854). As mentioned, whether the force used was reasonable is judged from the perspective of a reasonable officer on the scene. *Graham*, 490 U.S. at 396–97. The Ninth Circuit has indicated that police are entitled to use force when arresting a person who flees from police authority. *Chew v. Gates*, 27 F.3d 1432 (9th Cir. 1994). "[T]he level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Bryan*, 630 F.3d at 830.

As discussed above, at the time of his detention, Lopez was suspected of a civil traffic violation and suspected of possibly stealing an iced tea. Defendants assert, however, that Lopez posed an immediate threat to safety because he was running into a busy street with a lot of traffic, could have seriously injured himself or the people in cars trying to avoid him, he posed an immediate threat to officers, as he had thrown his drink onto Officer

Stevens in an attempt to flee, and he ignored Stevens' lawful command to stop running.

Plaintiff asserts that there was no underlying crime and even if Lopez was legitimately detained for jaywalking, potentially using drugs, taking an iced tea without paying, or splashing his drink on an officer, none of those are serious, violent, or dangerous crimes that warrant a life-threatening level of force.  Plaintiff asserts that there was no ongoing crime, emergency, or exigent circumstance that supported the further use of force after Lopez was handcuffed.

> **a.    Holding Lopez Down after Application of Handcuffs and Application of the RIPP Restraint**

Defendants assert that application of a RIPP restraint is a minimal use of force and was reasonable under the circumstances given the rapidly unfolding situation and the danger of being in the roadway with traffic.  Defendants assert that the undisputed record demonstrates that the officers were concerned for their safety based on Lopez's resistance and the fact that he displayed a "great amount of strength" because of his use of methamphetamine. Plaintiff asserts that Defendants employed significant force when: (1) Officer Mosley kneeled on Lopez's back and legs for three minutes after Lopez was handcuffed and (2) Officer Jimenez applied the RIPP restraint and applied it in a manner that caused Lopez's legs to be bent and raised.  Plaintiff asserts that Lopez did not resist during the application of the RIPP restraint or after it was secured.

The record is undisputed that Lopez resisted after being handcuffed and showed extraordinary strength requiring the Defendant Officers to get control him.  It is likewise undisputed that Lopez grabbed the RIPP restraint as it was being applied.  Plaintiff has made no showing that the amount of force used was disproportionate given Lopez's resistance after being handcuffed and while the RIPP restraint was being applied.  Even though Plaintiff argues that Lopez's resistance was more passive than active, Plaintiff does not argue that the Officers did not need to control Lopez or ensure that he was fully compliant.  Accordingly, Plaintiff has not shown that the amount of force used during this part of the encounter was disproportionate to the Government's interest in the need for

force.  Moreover, Plaintiff has not cited to any cases showing that it was clearly established that the amount of force used was prohibited while Lopez was resisting during this part of the encounter.  *See Stickney v. City of Phoenix*, No. CV-20-01401-PHX-SMB-DCB, 2023 WL 2976943, at *29 (D. Ariz. Mar. 17, 2023) (Plaintiff did not cite to any cases "that firmly establish that attempting to attach a RIPP restraint from a prone subject's ankles to his handcuffs while the subject continues to resist violates clearly established law.").

Accordingly, summary judgment will be granted in favor of Defendants as to the force used up to and during the application of the RIPP restraint.

### b.    Kneeling on Lopez's Back After RIPP Applied

Defendants assert that Officer Mosley's use of force, placing his knee on Lopez's lower back and hamstring, was brief, not life threatening, and did not cause Lopez injury, and should be considered a minimal use of force. Defendants say that Officer Mosley's use of pressure to control and hold Lopez was reasonable under the circumstances because officers were dealing with a rapidly unfolding scene and Lopez had failed to heed multiple officer commands, continued to resist even after he was handcuffed, and grabbed onto the RIPP restraint as officers attempted to apply it and did not cooperate. Defendants assert that Lopez was still breathing, and Officer Mosley did not press all his weight onto Lopez's body, but rather placed his knee on Lopez's lower back and leg only to help control him.

Plaintiff asserts that Officer Mosley testified that he continued to apply pressure to Lopez's back after he was handcuffed, not because Lopez posed a threat to others, but because Mosley was allegedly protecting Lopez from potentially harming himself.[17]

---

[17] Plaintiff cites to the following testimony to support this argument:

> Q. So were you actively thinking at this point in time if I keep him in the prone position on the ground, he's at risk for the positional asphyxia, that if I don't have my hand on back somehow he's going to hurt himself or someone else?
>
> . . .
>
> [Mosley]: I've had prior incidents regarding someone that's restrained or controlled of, and they're able to put themselves in the situation of either -- of putting themselves in danger, so,

Plaintiff asserts that the Maricopa County Medical Examiner determined that "physical restraint" was a component of Lopez's cardiac arrest and subsequent death, and Plaintiff's experts have opined that restraint and compressive asphyxia contributed to Lopez's cardiac arrest and death.   Plaintiff asserts that as a result, a jury could conclude that Mosley's additional kneeling on Lopez's chest, after Lopez was placed in the RIPP restraint and no longer resisting caused injury that ultimately contributed to Lopez's death.

The video evidence reflects that Lopez was no longer resisting after he was RIPP restrained, and Mosley continued to kneel for no apparent reason. The Court must construe these facts in Plaintiff's favor. *See Longoria v. Pinal Cnty.*, 873 F.3d 699, 708 (9th Cir. 2017) ("When a suspect is killed and cannot himself provide an account of what took place, we must examine 'whether the officers' accounts are 'consistent with other known facts.'").

The Ninth Circuit has long held that "where there is no need for force, *any* force used is constitutionally unreasonable." *See, e.g.*, *Headwaters Forest Def. v. Cnty. of Humboldt*, 240 F.3d 1185, 1199 (9th Cir. 2000) (where there is no need for force, any force used is excessive), *vacated on other grounds*, *Cnty. of Humboldt v. Headwaters Forest Def.*, 534 U.S. 801 (2001); *see also Blankenhorn v. City of Orange*, 485 F.3d 463, 480 (9th Cir. 2007) (citing *Graham*'s "clear principle" that "force is only justified when there is a need for force"); *Motley v. Parks*, 432 F.3d 1072, 1088 (9th Cir. 2005) ("[t]he use of a

---

yes.
. . .
Q. My question was, was this like an active risk/benefit analysis that you were doing?
. . .
[Mosley]: Can you rephrase that for me?
Q. At this point in time the risk of keeping -- the longer you keep him in the prone position or face down, the greater the risk for positional asphyxia, correct?
. . .
[Mosley]: That is correct

(Doc. 115-1 at 66.)

force against a person who is helpless or has been subdued is constitutionally prohibited"), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012); *Fontana v. Haskin,* 262 F.3d 871, 880 (9th Cir.2001) ("[g]ratuitous and completely unnecessary acts of violence by the police during a seizure violate the Fourth Amendment"); *P.B. v. Koch*, 96 F.3d 1298, 1303–1304 & n.4 (9th Cir. 1996) ("since there was no need for force, [the defendant's] use of force was objectively unreasonable").

A reasonable jury could determine that after Lopez was fully restrained, no additional force was necessary. *See, e.g.*, *Abston v. City of Merced*, 506 F. App'x 650, 652–53 (9th Cir. 2013) ("A reasonable fact-finder could conclude that defendants' use of body compression as a means of restraint was unreasonable and unjustified by any threat of harm or escape when Abston was handcuffed and shackled, in a prone position, and surrounded by numerous officers."); *Tucker v. Las Vegas Metro. Police Dep't*, 470 F. App'x 627, 629 (9th Cir. 2012) ("Turning to the clearly established law inquiry, we conclude that existing law recognized a Fourth Amendment violation where two officers use their body pressure to restrain a delirious, prone, and handcuffed individual who poses no serious safety threat.").[18] Defendants further argue that there is no evidence that Mosley's additional kneeling caused Lopez injury. But a showing of injury is not necessary to support a Fourth Amendment excessive force claim. *See, e.g.*, *Wilks v. Reyes,* 5 F.3d 412, 416 (9th Cir.1993) (stating that nominal damages are available where constitutional rights are violated even if no injury resulted).

In sum, there is a disputed issue of material fact as to whether Lopez suffered injury because of Mosley's conduct. Summary judgment will be denied as to Mosley's kneeling against Lopez after the RIPP restraint was applied.

---

[18] Defendants cite to *Stickney* to support their position that Mosley could continue to kneel. But there, the Court found that the arrestee continued to resist. 2023 WL 2976943, at *27 ("[T]o the extent Arnold, Rodarme, and Long used excessive force when they applied weight to Casey's back to hold Casey down in a prone position while he continued to resist, these officers are entitled to qualified immunity on the ground that the right of an actively resistant subject to be free from such positional restraints was not clearly established.").

**c.      Face down Transportation with Legs Bent**

Defendants assert that Officers wanted to move Lopez out of the road as soon as possible, but he failed to heed multiple commands and was still kicking and tensing up and resisting the officers. They did not have a less intrusive means to control and move Lopez.

Plaintiff asserts that Officers Mosley, Stevens, Jimenez, and Lingenfelter unnecessarily positioned Lopez face down in the back of a police vehicle while he was handcuffed and hogtied and Officers Lopez and Cozad transported Lopez to a nearby parking lot while he was prone, handcuffed, and hogtied.

Defendants assert that placing Lopez in the back of the vehicle was "not force at all," and placing Lopez in a "prone position" in the back of the car for less than two minutes is not clearly established excessive force.  Defendants assert that they needed to move Lopez out of a busy street while they waited for the Fire Department to come and provide medical care and putting him in the vehicle was the only way to do so because they could not remove the RIPP restraint given how Lopez was resisting them. Defendants assert that even if placing Lopez face down in the vehicle in the RIPP restraint was force, it was reasonable under the circumstances.

Plaintiff asserts that as officers arrived on the scene, they positioned their vehicles to block traffic, so other cars on the road posed no immediate threat to the officers who were involved in restraining Lopez.  Plaintiff argues that the Officer Defendants' claim that they placed Lopez face down in Officer Lopez's Tahoe to get him to the parking lot for his own safety does not justify putting his life in danger by placing him face down in the vehicle while RIPP-tied.

Plaintiff asserts that Lopez did not resist when the officers placed him in Officer Lopez's Tahoe, and although there was no need for any additional force, Defendants employed significant and, ultimately, life threatening force when Officers Mosley, Stevens, Jimenez, and Lingenfelter placed Lopez prone in the Tahoe while he was RIPP-restrained and in handcuffs; and Officers Lopez and Cozad transported Lopez while he was prone, handcuffed, and RIPP-restrained.

Plaintiff asserts that other facts weigh against the force used, including that the officers believed Lopez was likely on drugs or mentally ill, the officers never told Lopez he was under arrest, and they did not give him any warning before using force. Plaintiff asserts that there was no reason why the officers could not sit Lopez upright in the vehicle and wait there for fire personnel to arrive, especially because traffic had already been blocked around that lane.

Plaintiff points to testimony of her police practices expert, Scott DeFoe, who opines that the officers knew or should have known of the risk of positional asphyxia associated with the prone position and should not have placed Lopez prone in the Tahoe for any length of time, and there was no reason why the officers could not sit Lopez upright either in the back of the Tahoe or off of the roadway and wait there for EMS to arrive.  (Doc. 115 ¶ 212.) Defoe asserts that the RIPP restraint was secured and would have prevented Lopez from kicking until he was secured on a gurney or stretcher.  (*Id.*)  Defoe asserts that the subject in leg restraints should not be transported face down, and if the subject moves to a face down position, the transporting officers are to pull over and move the subject to his side or to an upright position. (*Id.* ¶ 192.) Defoe opines that Officers Lopez and Cozad violated Phoenix Police Department policy by failing to continuously monitor Lopez once he was placed in the back of their vehicle because they knew or should have known the prone position placed Lopez at risk of positional asphyxia.  (*Id.* ¶ 213.)

The existence of the video creates a disputed issue of material fact as to whether Lopez was "still kicking and tensing up and resisting the officers" after the RIPP restraint was applied.  *Smith*, 394 F.3d at 701 (an officer is not entitled to summary judgment if the evidence, viewed in the nonmovant's favor, could support a finding of excessive force); *Longoria*, 873 F.3d at 708. Viewing the facts in Plaintiff's favor, there was no resistance, and no need for additional force when Lopez was placed face down in the vehicle while handcuffed and RIPP restrained, in a position that brought his knees up behind him. Defendants have offered no justification for why Lopez was transported face down.

It is well-established that overly tight handcuffing can constitute excessive force

where the handcuffs caused demonstrable injury or unnecessary pain, or when officers ignored or refused requests to loosen the handcuffs once alerted that the handcuffs were too tight. *See Wall v. County of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004); *LaLonde v. County of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000); *Thompson v. Lake*, 607 F. App'x 624, 625–26 (9th Cir. 2015) (citing cases). The use of RIPP restraints poses a much greater danger than handcuffs and it is obvious that if restraint by handcuffs can violate the Constitution if used improperly, the use of RIPP restraints, a more severe form of restraint, can violate the Constitution if used improperly. Thus, it is clearly established that restraint that causes injury or unnecessary pain can cause a constitutional injury if such restraint is not justified by a governmental interest. *Garlick v. Cnty. of Kern*, 167 F. Supp. 3d 1117, 1156 (E.D. Cal. 2016) (citing *LaLonde* for the proposition that "tight handcuffing, even without hogtying, though nonlethal, is nontrivial and may constitute excessive force."); *see Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1130 (9th Cir. 2017 ("[Deadly] force generally can't be used on a prone suspect who exhibits no resistance, carries no weapon, is surrounded by sufficient officers to restrain him and is not suspected of a violent crime."); *Deorle*, 272 F.3d at 1281 ("A desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury"); *Drummond*, 343 F.3d at 1061–62 ("[I]n a situation in which an arrestee surrenders and is rendered helpless, any reasonable officer would know that a continued use of force ***or a refusal without cause to alleviate its harmful effects*** constitutes excessive force.") (quoting *LaLonde,* 204 F.3d at 961) (emphasis added).

If Defendants were somehow unaware that placing Lopez face down in the vehicle while fully restrained, with his legs forced behind him in a hog tie position, was potentially injurious or life threatening, they may still be entitled to qualified immunity. But, here, the evidence shows that the Defendant officers were trained not to hogtie when using the RIPP restraint, that after application of the RIPP restraint, the subject should be seated upright and monitored for a medical emergency, that when placing someone in a vehicle, the officers should remove the clip from the cuffs, the subject should be seated upright in the

vehicle, and the clip should be secured on ground with the foot and to close the vehicle door, and attached to the seatbelt of front seat.  Defendants were further trained that subjects apparently under the influence of drugs, as Defendants suspected Lopez was here, may be at increased risk of injury or death by positional asphyxiation when a suspect is kept face down for a prolonged period of time, and the guidelines for use of leg restraints instruct that when using a RIPP restraint, officers should minimize the face down exposure of the prisoner and should place prisoners in an upright position, on their side or back.  As such, the officers were fully aware of the danger posed by using the restraint, and nonetheless positioned Lopez face down with his knees forced behind his back, even though they suspected he was on drugs and at a greater risk of positional asphyxiation.  *See Drummond* 343 F.3d at 1059–60 (training materials and regulations are relevant, although not dispositive, to determining whether reasonable officers would have been on notice that their conduct was unreasonable); *see also Hope v. Pelzer*, 536 U.S. 730, 741–42, (2002) (considering an Alabama Department of Corrections regulation and a Department of Justice report in its qualified immunity analysis).

Defendants assert that they were on an extremely busy street, and traffic was still moving around them in all other lanes, which can be seen on the body worn camera footage, and the Officers moved Lopez for the express purpose of getting out of the road.  But a reasonable jury could find that the method of transporting Lopez face down while RIPP restrained and handcuffed was unnecessary force that posed a risk of death and that there were other, less dangerous, ways of transporting Lopez that were readily available to the Officers, including by using the RIPP restraint as intended in a vehicle and transporting Lopez upright or simply carrying him to one of the many businesses surrounding the road.

For the foregoing reasons, there are disputed issues of material fact as to whether any force was necessary when the officers placed Lopez in the vehicle and transported him face down while he was handcuffed and RIPP restrained.  Summary judgment will therefore be denied as to that part of the excessive force claim.

### 3.     Failure to Intervene

Defendants assert that they are entitled to summary judgment on Plaintiff's claim for failure to intervene because they did not have a meaningful opportunity to intercede in the actions of the other Officers as they were required to get involved in a rapidly evolving situation. Regarding placing Lopez in the vehicle and transporting him face down while he was handcuffed and RIPP restrained, a reasonable jury could find that each of the Defendants was involved in the choice to place Lopez in the vehicle in that position or that they failed to intervene to stop the force.

Regarding Mosley continuing to kneel against Lopez after he was RIPP restrained, Plaintiff asserts that any of the officers could have told Officer Mosley to remove his knee from Lopez and place him in a recovery position.  Defendants present no evidence and do not specifically address whether the other Defendant officers had no realistic opportunity to intervene or did not see or appreciate what Mosley was doing.  In the absence of any evidence showing that the Officers were unaware of the force used or unable to intervene, there is a disputed issue of material fact as to whether the other Officer Defendants could have intervened to stop Mosley's additional force.  If a jury finds such force was unnecessary, it could likewise find that the other Officers failed to intervene to stop the force.  Accordingly, summary judgment will be denied as to the failure to intervene claim to the extent it is premised on Mosley's use of force or the decision to place and transport Lopez face down while handcuffed and RIPP restrained.  Summary Judgment will be granted as to the failure to intervene claim to the extent it is premised on uses of force for which the Court has already granted summary judgment.

### C.     Fourteenth Amendment Right to Familial Society and Companionship (Count Two)

Defendants assert that they are entitled to summary judgment on Plaintiff's Fourteenth Amendment claim because they were responding to a rapidly unfolding situation and did not have time to deliberate, and Plaintiff has not shown a purpose to harm Lopez unrelated to legitimate law enforcement objectives. They further argue that the Officers are entitled to qualified immunity.

Plaintiff argues that the Officer Defendants had time to deliberate their actions and therefore the deliberate indifference standard applies to Lopez's claim. Plaintiff asserts that, after Lopez was in handcuffs, Officers Stevens, Williams, and Mosley had several minutes to deliberate and get Lopez into a recovery position, but they did not. Plaintiff asserts that when Officers Jimenez, Lopez, Cozad, and Lingenfelter arrived, the situation was not escalating or rapidly evolving and any of the Officer Defendants could have paused to deliberate on how to resolve the situation and get Lopez into a recovery position and safely out of the street, but instead they rapidly increased their use of force through body compression, application of the RIPP restraint, and the prone transport to the Walgreens parking lot. Plaintiff asserts that the Officer Defendants continued to use physical force even though they knew that their actions placed Lopez at risk of positional asphyxia and that he was becoming increasingly distressed. Plaintiff asserts that, as a result, a jury could therefore conclude that the Officer Defendants acted with deliberate indifference toward Lopez's rights and safety and that their actions shocked the conscience.

### 1.      Legal Standard

"The substantive due process right to family integrity or to familial association is well established," and the state's interference with this liberty interest without due process of law is remediable under § 1983. *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) (citation omitted). "To amount to a violation of substantive due process, however, the harmful conduct must shock [ ] the conscience' or 'offend the community's sense of fair play and decency.'" *Rochin v. California,* 342 U.S. 165, 172–73 (1952). The "shocks-the-conscience" standard is, depending on the circumstances, met either by showing that a defendant (1) acted with "deliberate indifference" or (2) with a "purpose to harm*"* for reasons unrelated to legitimate law enforcement objectives. *Porter v. Osborn*, 546 F.3d 1132, 1137 (9th Cir. 2008) (citing *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)). Under the first situation, if a defendant is in a position "[w]here actual deliberation is practical," then his deliberate indifference to the harm he caused may be sufficient to "shock the conscience." *Gantt v. City of Los Angeles*, 717 F.3d 702, 707–08

(9th Cir. 2013) (quoting *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010)). "On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation," then the courts apply the "purpose-to-harm" standard. *Id.* (quoting *Wilkinson*, 610 F.3d at 554).

Under Supreme Court precedent, conduct that "shocks the conscience" includes conduct that violates the "decencies of civilized conduct," that is "brutal" or "offensive" or "arbitrary." *Cnty. of Sacramento*, 523 U.S. at 846–47 (citations omitted). Negligence, however, "is categorically beneath the threshold of constitutional due process." *Id.* at 849. Whether conduct such as recklessness or gross negligence shocks the conscience "is a matter for closer calls." *Id.* at 849 (noting that rules of due process are not "subject to mechanical application" and depend on the particular facts in a case).

"Legitimate objectives can include arrest, self-protection, and protection of the public," and "[i]llegitimate objectives include '[whether] the officer had any ulterior motives for using force against the suspect, such as to bully a suspect or get even, or when an officer uses force against a clearly harmless or subdued suspect.'" *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022) (cleaned up).

### 2. Constitutional Violation

Prior to the application of the RIPP restraint, while Lopez was resisting, Officers were forced to make snap decisions and the purpose to harm standard applies. There is no evidence that Officers were motivated by illegitimate objectives during this time, and summary judgment will be granted to the extent Plaintiff's Fourteenth Amendment claim is based on force used prior to and including application of the RIPP restraint.

The evidence shows, however, that actual deliberation was practical at the times of the remaining uses of force after the application of the RIPP restraint. The body camera footage shows that the Officers were relaxed and joking and were standing around while Mosley kneeled against Lopez and while making the decisions as to how to transport Lopez. A reasonable jury could conclude that the Officer Defendants were deliberately indifferent to a serious risk to Lopez's safety while Mosley kneeled against Lopez after he

was RIPP restrained and when they decided to transport Lopez in the manner that they did.

### 3.   Clearly Established

Defendants argue "[e]ven if Plaintiffs could somehow establish the officers acted outside of legitimate law enforcement objectives[,] the officers are entitled to qualified immunity for their acts because no similar case put them on notice that their conduct violated Plaintiffs' Fourteenth Amendment rights." (Doc. 102 at 21.)  In response to the Motion for Summary Judgment, Plaintiff did not address this argument.

Although Plaintiff cited to Fourth Amendment excessive force cases in support of her argument that the Fourth Amendment violation was clearly established, the Ninth Circuit holds that "Fourth Amendment cases cannot clearly establish the contours of the Fourteenth Amendment right, despite similarities between the standards." *Nicholson v. City of Los Angeles*, 935 F.3d 685, 696 (9th Cir. 2019).

Because Plaintiff did not address this argument, she has not met her burden of showing that the Fourteenth Amendment violation was clearly established. *See Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021) ("[P]laintiff bears the burden of proof that the right allegedly violated was clearly established at the time of the alleged misconduct.") (citation omitted).  Accordingly, summary judgment will be granted in favor of Defendants on Count Two because they are entitled to qualified immunity.

### D.   *Monell* claims against the City of Phoenix (Count Three)

The City asserts that it is entitled to summary judgment on Plaintiff's *Monell* claims. The City asserts that Plaintiff's *Monell* training claim fails because she cannot refute that the individual officers completed all training requirements for AZPOST certification.  The City asserts that the record lacks evidence of any pattern of deficient training to put the City on notice that its training and policies regarding police procedures, restraint of suspects, or use of force were deficient.  The City asserts that its policy on use of force properly instructed the individual officers on the appropriate scope of force with takedown maneuvers and restraint, including the potential of positional asphyxia, and the City maintained policies on restraint and transportation of restrained suspects.  The City asserts

that the record lacks evidence of prior incidents that would put it on notice that its policies were deficient.  The City asserts that because there was no formal or informal policy, practice, or custom by the City that was the moving force behind Lopez's injuries or that constituted deliberate indifference toward Lopez's rights, the City is entitled to summary judgment on Plaintiff's *Monell* claims.[19]

In response, Plaintiff asserts that the City failed to properly train officers on submission techniques that pose a risk of positional asphyxia and failed to properly train them on interacting with individuals who are mentally disturbed due to intoxication or mental illness. Defoe, Plaintiff's police practices expert, opines that the Phoenix Police Department failed to properly train the Officer Defendants on the risk of

---

[19]    The City also argues that (1) Plaintiff's *Monell* claim on the ground that the officers failed to follow the City's policies and procedures, such an argument cannot establish *Monell* liability; (2) Plaintiff's claim for negligent hiring fails because a plaintiff must demonstrate deliberate indifference in hiring, and liability is only proper where "adequate scrutiny of an applicant's background would lead a reasonable policymaker to conclude that the plainly obvious consequence of the decision to hire the applicant would be the deprivation of a third party's federally protected right[,]" (Doc. 102 at 24) (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410–11 (1997)), but there is no evidence that the City failed to properly hire any of the individuals involved; (3) to the extent Plaintiff's *Monell* claim is based on failure to supervise, the City is entitled to summary judgment because the record demonstrates that the individual Defendants were adequately and routinely supervised while they were in the field and no evidence shows the City should have provided additional supervision to these officers because of any relevant prior actions by the individual Defendants; and (4) to the extent that Plaintiff's Complaint could be construed as including a claim based on ratification, there is no evidence that the City had a policy that tolerated or ratified Defendants' conduct, but rather, the City enacted policies to ensure discipline for out-of-policy conduct.

Plaintiff did not allege these theories of *Monell* liability in the Complaint and did not respond to these theories of *Monell* liability in her Response to the Motion for Summary Judgment.  Indeed, Plaintiff expressly disclaims any theory based on ratification.  (Doc. 114 at 29 n.3. ("Defendants' motion for summary judgment references a § 1983 ratification claim. . . .  Plaintiff is not asserting a ratification claim and does not allege that an authorized policymaker expressly approved of an unconstitutional decision.").  Accordingly, the Court will not further address these arguments regarding Plaintiff's possible theories of *Monell* liability.

positional/restraint/compression asphyxia, transporting subjects, the duty to intervene, recognizing agonal breathing, and performing CPR and failed to train the Officer Defendants in proper communication and crisis intervention techniques and failed to establish a crisis intervention team that could have assisted them during the encounter and provided Lopez with proper mental health treatment. Defoe's opinion regarding the former is primarily based on Williams, Stevens, Lopez, Lingenfelter, Cozad, and Jimenez's testimony that they were either not trained or could not recall whether they were trained in subjects relating to positional asphyxia and RIPP restraints. (Doc. 115-1 at 188–190.).

Plaintiff asserts that in *Stickney*, the City of Phoenix's Rule 30(b)(6) representative, Joshua Calle, testified about the training provided to Phoenix police officers and testified that under Phoenix Police Department policy, there is no restriction that prevents officers from placing their body weight on the back of a prone subject; rather the objective of the training is "to gain control and then move on." (Doc. 115 ¶ 219.) Sergeant Calle testified that Phoenix police officers are trained that there is an "expectation" that officers will roll a prone subject to the position of recovery "[i]f they're solely laying down in handcuffs and RIPP restraint, there's no longer physical actions of assault, they're not in active aggression, they're not a danger to self or others and they're able to be rolled over . . . that would be the expectation." (*Id.* ¶ 221.) Mr. Calle stated that officers are trained that they still have to be able to detain and control the subject, and if issues like positional asphyxia or excited delirium are present, "the training is consistent with getting control and getting that subject into a recovery position and requesting fire or EMS." (*Id.* ¶ 222.) Based on this testimony, Plaintiff asserts that "[w]hile Phoenix police officers are trained that they should try to minimize face down exposure, they are not trained that there is any time limit that a subject may be safely restrained in that manner." (Doc. 114 at 25.)

Plaintiff asserts that although the City of Phoenix does not track in-custody deaths where positional asphyxia occurred, the following cases show that the City had notice of its improper training: (1) Casey Wells on February 6, 2019; (2) Muhammad Muhaymin on January 4, 2017; (3) Edgardo Figueroa on December 25, 2014; and (4) Ernest "Marty"

Atencio in December 2011.[20]  (*Id.* at 26.)  Plaintiff asserts that Phoenix police officers were "involved in" at least four prone restraint deaths in a five-year period between 2017 and 2021," which establishes a pattern from which a "jury could reasonably find that the City was deliberately indifferent to the need for more or different training."[21]  (*Id.*)

Plaintiff argues that even if the Court finds there was no pattern of prone restraint deaths, the City is still not entitled to summary judgment because the need for more and better training was obvious because it is entirely predictable—and virtually certain—that police officers will encounter individuals who are under the influence of drugs or experiencing a mental health crisis and officers will come into contact with individuals who do not fully or immediately comply with commands or who display some level of resistance.  Plaintiff asserts that it is obvious that without adequate training on when and how prone restraint techniques could be deadly and should be limited or avoided, officers will predictably use more force than reasonably necessary when taking such individuals into custody.  Plaintiff asserts that the City's training was patently inadequate in relation to the tasks that officers are expected to perform.

Plaintiff next argues that deliberate indifference is also established because it was obvious and apparent that, without adequate crisis intervention training, officers would be limited in their abilities to interact with individuals who are under the influence of drugs or experiencing mental illness and those interactions will inevitably escalate in a manner that results in the "highly predictable consequence" of constitutional violations.

Plaintiff asserts that the City also has a policy allowing use of force records to be "purged" and maintains a custom of indifference for use of force investigations and

---

[20] Plaintiff also cites the death of Akeem Terrell on January 1, 2021, but it is unclear how is relevant to the issues here since that death occurred after the August 4, 2020, incident involving Lopez.

[21] Plaintiff has pointed to two deaths in the five-year period before Lopez died and four deaths in the eight-year period before Lopez died.  As noted above, the 2021 death of Terrell that occurred after Lopez's death cannot serve to support Plaintiff's arguments that the City was a notice of a need for better training in this action.

maintains deliberately indifferent policies and practices for purging use-of-force records and reviewing use-of-force incidents.

### 1.       Additional Facts Relevant to Counts Three and Four

Prior to being hired by the City, the Defendant officers had never been disciplined for use of force in any other circumstance.  (Doc. 103 ¶ 90; Doc. 115 ¶ 90.)  The officers disclosed all pertinent employment and personal history information to the City of Phoenix. (Doc. 103 ¶ 91; Doc. 115 ¶ 91.)  All officers have direct supervision from a higher-ranked officer and receive yearly reviews and evaluations.  (Doc. 103 ¶ 92; Doc. 115 ¶ 92.)  The City of Phoenix Police Department has a variety of policies relating to administrative action, training, and discipline.  (Doc. 103 ¶ 93; Doc. 115 ¶ 93.)  This includes policies on use of force, restraining suspects, transporting restrained suspects, and the potential of positional asphyxia.  (Doc. 103 ¶ 94; Doc. 115 ¶ 94.)  The officers received training on these policies and were certified by AZPOST.  (Doc. 103 ¶ 95; Doc. 115 ¶ 95.)

Office Lingenfelter was investigated for use of force in one previous instance.  (Doc. 103 ¶ 96; Doc. 115 ¶ 96.)  None of the other officers had any relevant use of force issues or discipline prior to the incident.  (Doc. 103 ¶ 97.)

The City of Phoenix Police Department does not track in-custody deaths in which prone restraint occurred.  (Doc. 115 ¶ 226.)  Phoenix Police Department Professional Standards Bureau investigations and Use of Force Review Boards are not provided with any information on an officer's past use of force history and have no way of determining whether an officer has a history of using force more frequently than others.  (*Id.* ¶ 227.) The Phoenix Police Department allows officers to purge use of force records from their files on a yearly basis if a use of force was found to be within policy.  (*Id.* ¶ 228.)  Prior to 2015, officer uses of force were documented in the PACE database, which was purged much more extensively than recent records.  (*Id.*)

### 2.       Legal Standard

A government entity may not be held liable under § 1983 unless a policy, practice, or custom of the entity can be shown to be the cause of or directly related to a violation of

constitutional rights.  *Monell v. Dept. of Soc. Serv. of the City of New York*, 436 U.S. 658, 694 (1978).  To state a claim based on a policy, practice, or custom of Defendant City of Phoenix, Plaintiff must allege facts showing (1) that Lopez's constitutional rights were violated by an employee or employees of the Defendant; (2) that the Defendant has customs or policies that amount to deliberate indifference; and (3) that the policies or customs were the moving force behind the violation of Lopez's constitutional rights in the sense that Defendant City of Phoenix could have prevented the violation with an appropriate policy. *See Gibson v. Cnty. of Washoe*, 290 F.3d 1175, 1193–94 (9th Cir. 2002).  "Policies of omission regarding the supervision of employees . . . can be policies or customs that create . . . liability . . . , but only if the omission reflects a deliberate or conscious choice to countenance the possibility of a constitutional violation."  *Id.* at 1194 (quotations omitted).

A "decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011).  To support a *Monell* claim for failure to train under § 1983, a plaintiff must allege facts demonstrating that the local government's failure to train amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *Id.* at 61 (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

Deliberate indifference may be shown if there are facts to support that "in light of the duties assigned to specific officers or employees, the need for more or different training is obvious, and the inadequacy so likely to result in violations of constitutional rights, that the policy-makers . . . can reasonably be said to have been deliberately indifferent to the need."  *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002) (citing *Canton*, 489 U.S. at 390).  While "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train," *Connick*, 563 U.S. at 62, a plaintiff may still prove a failure-to-train claim without showing a pattern of constitutional violations where a violation "may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools

to handle recurring situations." *Long v. Cnty. of L.A.*, 442 F.3d 1178, 1186 (9th Cir. 2006) (internal citation omitted).  In such instances, "failing to train could be so patently obvious that [an entity] could be liable under § 1983 without proof of a pre-existing pattern of violations."  *Connick*, 563 F.3d at 64.

A plaintiff may prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded.  *See Gillette v. Delmore*, 979 F.2d 1342, 1348 (9th Cir. 1992); *Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001).

### 3.    Analysis

#### i.    Purging of Use of Force Records

Plaintiff asserts that the City has a policy allowing use of force records to be "purged," maintains a custom of indifference for use of force investigations and maintains deliberately indifferent policies and practices for purging use-of-force records and reviewing use-of-force incidents.  Plaintiff asserts that this creates a culture of impunity and consequently leads officers to feel immunized for their uses of force.  Plaintiff asserts that the City does not track in-custody deaths in which prone restraint occurred, and since 2009, the Phoenix Police Department Professional Standards Bureau has never found an in-custody death out of policy.  Plaintiff further asserts that if a use of force was found to be within policy—as all in-custody deaths have been since 2009—then records pertaining to an officer's use of force or aggregate uses of force are purged yearly.  Plaintiff asserts that these types of practices have a ripple effect because they lead other officers within the department to believe they can engage in similar conduct without consequences.

Plaintiff's argument is problematic because it is both speculative and fails to provide the necessary link between the City's alleged policy and the constitutional violation that occurred in this case.  If Plaintiff had evidence that the City had improperly purged prior records of an individual Defendant's relevant use of force, she might be able to link the policy to the constitutional violation in this case.  But Plaintiff produces no such evidence.  Rather, Plaintiff relies on speculative theories that purging records of prior uses of force

found to be within policy may have emboldened Defendants to use unnecessary force in this case. But Plaintiff does not support this claim with evidence. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."). Accordingly, to the extent Plaintiff's *Monell* claim is based on purging use-of-force records and reviewing use-of-force incidents, summary judgment will be granted in favor of Defendant City of Phoenix.

### ii. Failure to Train Based on Prior Deaths

Plaintiff asserts that the following cases show that the City had notice of its improper training: (1) Casey Wells on February 6, 2019; (2) Muhammad Muhaymin on January 4, 2017; (3) Edgardo Figueroa on December 25, 2014; and (4) Ernest "Marty" Atencio in December 2011.

Although a plaintiff may prove the existence of a custom or informal policy with evidence of repeated constitutional violations for which the errant municipal officials were not discharged or reprimanded, *see Gomez v. Vernon*, 255 F.3d 1118, 1127 (9th Cir. 2001); *Gillette v. Elmore*, 979 F.2d 1342, 1348 (9th Cir. 1992), Plaintiff's argument lacks any evidentiary support. Plaintiff simply cites to these cases to argue that they are somehow relevant to the claims regarding deficient training in this case. Simply citing to the case number or citation of other cases, where it has been alleged that someone died due to prone restraint shows nothing about the facts of those cases, their similarities to the instant case, the City's policies at the times of those cases, whether the City made any changes in response to those cases, what City officials knew about those cases, or any other facts to support Plaintiff's argument. The allegations in other lawsuits are not evidence and Plaintiff has not produced any evidence supporting her arguments.

Defendants point out that in *Stickney*, the Court noted that Plaintiff's citation to cases in other Courts was unhelpful in resolving the Motion for Summary Judgment. The Court recounted that Plaintiff argued that several other lawsuits put the City on notice of

problems with positional asphyxiation, but noted that Plaintiff had not actually produced any evidence regarding those other cases:

> Absent any evidence regarding the actions of Phoenix Police officers in any of these cases or any evidence regarding the City's responses, including its review of these alleged incidents and whether it implemented any new or additional trainings at the relevant times, merely referring to three cases that allegedly involved deaths caused by positional asphyxia, one of which may not even have involved Phoenix Police officers, fails to show that the City was on notice of gaps in its training and was deliberately indifferent to an obvious need for more and different training prior to the uses of force in this action.  For the above reasons, Plaintiff's *Monell* claim based on the City's alleged failure to train fails as a matter of law.

*Stickney*,  2023 WL 2976943, at *41.  Plaintiff asserts that in *Stickney*, "the district court found that Muhaymin, Ontiveros, and Atencio, for various reasons based on procedural posture, the facts available to the plaintiff, or the length of time that had passed, did not place the City on notice of the need for more or additional training" but argues that "a case should not have to proceed to trial and result in a plaintiff's verdict before a pattern is established."  (Doc. 114 at 26.)  Plaintiff seems to misunderstand the holding in *Stickney* and her burden here.  Plaintiff is required to come forward *with evidence* showing a disputed issue of material fact.  Plaintiff does not even cite to anything specific in those cases that seemingly constitute evidence supporting her arguments; she simply cites to the cases themselves.  The Court may not take judicial notice of unproven hearsay allegations in other cases and Plaintiff has not otherwise produced evidence supporting any of her generalized arguments as to those cases.  Accordingly, Plaintiff's argument that those other cases support her failure to train claim fails.

### iii.    Failure to Train Based on Obviousness

The City asserts that the record lacks evidence of any pattern of deficient training to put it on notice that its training and policies regarding police procedures, restraint of suspects, or use of force were deficient.

Plaintiff asserts that the need for more or better training is obvious and the City is

not entitled to summary judgment because police officers will encounter individuals who are under the influence of drugs or experiencing a mental health crisis and officers will come into contact with individuals who do not fully or immediately comply with commands or who display some level of resistance, and without adequate training on when and how prone restraint techniques could be deadly and should be limited or avoided, officers will predictably use more force than reasonably necessary when taking such individuals into custody.  Plaintiff asserts that the City's training was patently inadequate in relation to the tasks that officers are expected to perform.

> It may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton*, 489 U.S. at 390.

It is "ordinarily necessary" to allege facts demonstrating a pattern of similar constitutional violations by untrained employees to demonstrate deliberate indifference for purposes of showing a claim for failure to train and supervise.  *Connick*, 563 U.S. at 62. By showing a pattern of similar violations, a plaintiff can establish that policymakers were on "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights."  *Id.*  Thus, a *Monell* claim generally must be based on more than "[a] single constitutional deprivation" or an isolated incident.  *Christie v. Iopa*, 176 F.3d 1231, 1235 (9th Cir. 1999).

A plaintiff may still prove a failure-to-train claim without showing a pattern of constitutional violations where a violation "may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (internal quotation marks and citation omitted).  In such instances, "failing to train could be so patently obvious that

1   [an entity] could be liable under § 1983 without proof of a pre-existing pattern of

2   violations." *Connick*, 563 F.3d at 63–64.

3        For example, in *City of Canton v. Harris*, the Court hypothesized that if a city knows

4   that its police officers will be required to arrest fleeing felons, and the city arms its officers

5   with firearms to accomplish this task, "the need to train officers in the constitutional

6   limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so

7   could properly be characterized as 'deliberate indifference' to constitutional rights."  489

8   U.S. at 390 n.10 (internal citation omitted).

9
10
11
12
13
> That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program. . . . It may be, for example, that an otherwise sound program has occasionally been negligently administered.

14   *Id.* at 390.

15        Here, Plaintiff offers only general arguments that the City's training program is so

16   inadequate that it led to Lopez's death. Again, Plaintiff does not support her arguments

17   with specific theories or evidence. As discussed above, the City has policies regarding

18   positional asphyxia and the use of RIPP restraints.  Defendants present evidence that the

19   individual Defendants[22] were trained in the proper use of RIPP restraints, and as discussed

20   more above, the materials provided by Plaintiff and Defendants show that after placement

21   in the RIPP restraint, the person in the RIPP restraint should not be left face down. (*See*

22   Doc. 103-1 at 82–84, 96 (Stevens' training records showing that he took training called

23   "Sudden Custody Death Syndrome & RIPP,"); 103-2 at 62–63 (Lopez's training records

24   showing that he took trainings called "RIPP Restraint Hobble," "Sudden Custody Death

25   Syndrome & RIPP," and "Restraint Systems and Positional Asphyxia"; Doc. 103-2 at 9

26
27        [22] It is unclear whether Williams received similar training regarding positional
28   asphyxia or RIPP restraints, but Plaintiff makes no specific arguments regarding any
     particular officer's training.

(Mosley's training records showing that he took training called "RIPP Restraint Hobble"); Doc. 103-3 at 11 (Cozad's training records showing that she took training called "RIPP Restraint Hobble"); Doc. 103-4 at 28–42 (Ligenfelter's training records showing that he took a training called "RIPP Restraint Hobble"); Doc. 103-4 at 62 (Jimenez's training record showing that he took a training called "RIPP Restraint Hobble").)

Plaintiff asserts that because the Defendant Officers did not properly comply with the City's policies, this shows that the trainings must have been insufficient. But the Supreme Court specifically foreclosed such a theory in *City of Canton*. *See* 489 U.S. at 390–391 ("Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.").

Because Plaintiff has offered no specific theories for how the City's training is so inadequate that it led to Lopez's death, summary judgment will be granted in favor of the City as to the failure to train claim.

### E.   Wrongful Death against the City of Phoenix (Count Four)

#### 1.   Vicarious Liability

The City argues that Arizona Revised Statutes § 13-413 precludes civil liability for "engaging in conduct otherwise justified" under Arizona law. The City argues that under § 13-410(C), officers are immunized for using even deadly force during an arrest or detention where necessary to prevent a person from harming others. As a result, the City argues that summary judgment is appropriate on any claim against the City based on vicarious liability for the officers.

Plaintiff argues that the use of deadly force is justified only if the officer reasonably believes it is necessary to defend himself or a third person from the imminent use of deadly

physical force or to effect an arrest or prevent the escape of a person who is committing or has committed a felony with a deadly weapon, but none of these circumstances are present here, and the City is not entitled to summary judgment on Plaintiff's state law claims based on the Officer Defendants' conduct.

In reply, the City asserts that the Officers reasonably believed that they needed to control Lopez because he was resisting arrest and he displayed superhuman strength as the result of his use of methamphetamine. The City asserts that, as a result, summary judgment is appropriate on Plaintiff's wrongful death claim based on vicarious liability.

As stated above regarding the excessive force argument, there are disputed issues of material fact as to whether Lopez provided any resistance after the RIPP restraint was applied. Defendants have not shown that they are entitled to immunity on the basis that it was necessary to prevent Lopez from harming others at the time the force was applied. Accordingly, the Motion for Summary Judgment will be denied as to vicarious liability for Mosley's act of kneeling against Lopez after the RIPP restraint was applied and the Defendant Officers leaving and transporting Lopez in a prone position after the RIPP restraint was applied.

### 2.    Negligent Training and Supervision

The City argues that the record lacks any evidence that it was negligent in its supervision or training of the individual Defendants in violation of Arizona law because the individual Defendants previously had never been disciplined for a use of force. The City argues that there is no evidence that it negligently trained the individual Defendants in violation of Arizona law because Plaintiff has not produced evidence showing what training should have been provided, and that its omission proximately caused the plaintiff's injuries. As a result, the City argues that it is entitled to summary judgment on Plaintiff's wrongful death claim.

Plaintiff argues that the City was aware that its officers would routinely encounter subjects who did not comply or engaged in some level of resistance and that officers would need to take subjects to the ground and handcuff them, but the City adopted training that

allowed officers to use prone restraint, compression, and RIPP restraints even when a subject was handcuffed, compliant, and offering no resistance.  Plaintiff asserts that a jury could, therefore, reasonably find that the City's training was inadequate under state law. Plaintiff argues that the City should also have known that, without proper training on prone restraint techniques and interacting with mentally disturbed individuals, its officers were not competent to handle those situations, and as a result, a jury could reasonably find that this inadequate supervision was a cause of Plaintiff's injuries.

The City replies that the record also lacks any evidence that it was negligent in its supervision or training of the individual Defendants, just as the record lacks any evidence for Plaintiff's *Monell* claim. The City asserts that for a negligent supervision claim, Arizona law requires a showing that the employee's act was foreseeable, but the record lacks any evidence that the City was aware that any of the individual Defendants might be negligent. The City asserts that the record lacks any evidence that the City's training was deficient or what training should have been provided. The City asserts that Plaintiff repeats the arguments from her *Monell* claims as to training, which are not supported by the record. The City asserts that Plaintiff's argument does not identify any specifically deficient training and does not identify any training that should have been provided.

### i.    Legal Standard

Arizona law holds employers accountable for the tortious conduct of their employees "if the employer was negligent or reckless in hiring, supervising, or otherwise training the employee."  *Hernandez v. Singh*, No. CV-17-08091-PCT-DWL; 2019 WL 367994, at *6 (D. Ariz. Jan. 30, 2019).  For negligent hiring, supervision, and training claims, "Arizona follows the Restatement (Second) of Agency § 213."  *Id.* (internal quotation marks and citation omitted).  According to § 213:

> A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless:
>
> (a) in giving improper or ambiguous orders of [sic] in failing to make proper regulations; or

(b) in the employment of improper persons or instrumentalities in work involving risk of harm to others[;]

(c) in the supervision of the activity; or

(d) in permitting, or failing to prevent, negligent or other tortious conduct by persons, whether or not his servants or agents, upon premises or with instrumentalities under his control.

Restatement (Second) of Agency § 213 (1958).

"For an employer to be held liable for the negligent hiring, retention, or supervision of an employee, a court must first find that the employee committed a tort." *Kuehn v. Stanley*, 91 P.3d 346, 352 (Ariz. Ct. App. 2004). If the threshold tort finding is satisfied, the employer may be liable "not because of the relation of the parties, but because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment." *Quinonez for & on Behalf of Quinonez v. Andersen*, 696 P.2d 1342, 1346 (Ariz. Ct. App. 1984).

To succeed on a negligent supervision claim, "the plaintiff must show the employer knew or should have known the employee was incompetent and that the employer subsequently failed to supervise the employee, ultimately causing the harm at issue." *Hernandez*, 2019 WL 367994 at *7. To prove negligent training, "a plaintiff must show a defendant's training or lack thereof was negligent and that such negligent training was the proximate cause of a plaintiff's injuries." *Guerra v. State*, 323 P.3d 765, 772 (Ariz. Ct. App. 2014), *vacated on other grounds in Guerra v. State*, 348 P.3d 423 (Ariz. 2015). Importantly, "[a] showing of an employee's incompetence is not necessarily enough; the plaintiff must also present evidence showing what training should have been provided, and that its omission proximately caused the plaintiff's injuries." *Id.* at 772–73.

### ii.   Analysis

Plaintiff has not presented evidence showing that the City knew the individual Officer Defendants were "incompetent," but nonetheless subsequently failed to supervise them. Accordingly, summary judgment will be granted in favor of Defendants as to the negligent supervision claim.

With regard to negligent training, Plaintiff asserts that the City was aware that its officers would routinely encounter subjects who did not comply or engaged in some level of resistance and that officers would need to take subjects to the ground and handcuff them, but the City adopted training that allowed officers to use prone restraint, compression, and RIPP restraints even when a subject was handcuffed, compliant, and offering no resistance. But, as discussed above, the City's materials do not reflect that the training was insufficient as applied to the facts of this case.  Indeed, if the Officers had complied with the City's policies, the additional acts of force would not have occurred.  Plaintiff's expert bases parts of his opinion on the fact that the Defendant officers did not remember some or all of their training, but Plaintiff makes no arguments about when or how often the trainings were given and the Court will not make Plaintiff's arguments for her.  Accordingly, summary judgment will be granted in favor of the City as to the negligent training claim.

### F.    Punitive Damages

Defendants assert that Plaintiff is not entitled to punitive damages as to her federal claims because her § 1983 claims fail, Plaintiff is not entitled to punitive damages against the City under § 1983, and punitive damages are not available for any state law violations pursuant to Arizona Revised Statutes § 12-820.04.

Plaintiff asserts that there is more than sufficient evidence in this case for a jury to conclude that the Officer Defendants acted with reckless or callous disregard of Lopez's Fourth Amendment rights because they knew that prolonged prone restraint placed Lopez at risk of positional asphyxia, but they continued to apply physical force to him while he was handcuffed, non-resisting, and non-threatening.

Plaintiff does not argue that she is seeking punitive damages under Arizona law or against the City under 42 U.S.C. § 1983. Plaintiff may not seek punitive damages as to her state law claims or against the City under § 1983. Ariz. Rev. Stat. § 12-820.04 ("Neither a public entity nor a public employee acting within the scope of his employment is liable for punitive or exemplary damages."); *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (a municipality is immune from punitive damages under 42 U.S.C. § 1983.").

Regarding punitive damages against the individual Defendants based on excessive force, whether punitive damages are warranted is an issue reserved for the jury. *See Smith v. Wade*, 461 U.S. 30, 48, 54, 56 (1983) ("punitive damages are awarded in the jury's discretion").  And here, a reasonable jury could conclude that the Defendant Officers exhibited conduct " shown to be . . . reckless or callous indifference to the federally protected rights of" Lopez, thereby warranting punitive damages. *Id.* at 56.  The request for summary judgment as to punitive damages will be denied as to punitive damages against the individual officers in their individual capacities as to the § 1983 claims.

## V. CONCLUSION

Accordingly,

**IT IS ORDERED:**

(1)    The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 102).

(2)    Defendants' Motion for Summary Judgment (Doc. 102) is **granted in part** and **denied in part** as follows:

(a)    The Motion is **denied** as to: (1) the Fourth Amendment excessive force claims in Count One to the extent they are premised on Mosley's use of force or the decision to place and transport Lopez face down while handcuffed and RIPP restrained; (2) the Fourth Amendment failure to intervene claims in Count One to the extent they are premised on Mosley's use of force or the decision to place and transport Lopez face down while handcuffed and RIPP restrained; (3) the wrongful death claim in Count Four to the extent it is based on vicarious liability; and (4) the punitive damages argument to the extent it is made with regard to the remaining § 1983 claims.

(b)    The Motion is otherwise **granted**.

. . . .

. . . .

. . . .

. . . .

(3)     This action is referred to Magistrate Judge Bruce Macdonald to conduct a settlement conference.  The parties must jointly contact the chambers of Magistrate Judge Macdonald at (520) 205-4520  within 14 days of the date of this Order to schedule a settlement conference.

Dated this 19th day of March 2024.


*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge